This is the case of A-Pro Towing and Recovery v. Martin Cantu Sr. Recording in progress. Counsel, we've been delayed a little bit, but we're ready for your case. I'm Judge Dennis, together with Judge King and Judge Poe, to be your panel in this case. I just read the name of it. The number is 2044599. And here are Martin Siegel and J. Arnold Aguilar. Let's hear from Mr. Siegel first. Go ahead, sir. Thank you, Your Honor. My name is Martin Siegel, and I represent the appellant A-Pro Towing and Recovery, LLC, in this case. The evidence in the record of this case would permit a jury to conclude that the appellee, Martin Cantu, a Port Isabel, Texas, city commissioner, systematically and wrongfully diverted towing business ordered by the Port Isabel Police Department away from A-Pro and to his own family's companies in an effort to line his own pockets. He did this through his own actions and through a subordinate, Chief Robert Lopez, of the police department there. Because this conduct is violative of the 14th Amendment's Equal Protection Clause, as well as its protection of occupational liberty, we believe the district court has been granting assembly judgment, and this court should reverse. Let me begin with our equal protection claim. A-Pro was subjected to a raft of a variety of differential forms of treatment. I won't go through them all. They're in the record. They include calls from Cantu to Mr. Garza of the police department, who was the dispatcher, telling him to bypass A-Pro and send that business over to his own family's companies. Similar instructions from Chief Lopez on several occasions. Sometimes Chief Lopez would simply take the schedule and white out or eliminate days that should have been assigned to A-Pro. And various other conducts intended essentially to harass A-Pro and to benefit Mr. Cantu's companies. Now, the district court was unpersuaded by that for three reasons. First of all, the district court said that we had not negated the explanation given by Mr. Cantu that the reason for the differential treatment was a supposed lapse in insurance and licensure. However, there is evidence in the record that would permit the jury to find that the real reason for the differential treatment to A-Pro was Mr. Cantu's official status. Gorsuch. I'm listening to your point very carefully here. The concern that your client was not qualified, didn't have the right licensing, insurance, what have you. Your response to that is not that it's not true. Your response is rather that that wasn't the motivating reason. Is that correct? Well, we're certainly not conceding that it's true. Our point is there's enough evidence. Very good. What is the summary judgment evidence that you were, in fact, adequately insured and whatnot? Well, it's just the evidence that I'm aware of in the record is an allegation or a statement in the affidavit of Chief Lopez. And he says three times I had to take them or suspend them or take them away because they didn't have insurance. That's the only evidence I'm aware of in the record about insurance. I don't believe there's documentary evidence. There's no affirmative evidence in the summary judgment record that you were, in fact, adequately insured. I'm not asking you what's in the real world. I'm asking you what's in the record. I don't believe there's documentary evidence in the record that we were insured. And why is that not a problem for you? Because believe me, I get the narrative that you're putting forth, and it's a compelling one, of self-dealing to favor the family and the businesses of a powerful local politician. I get the narrative. The counterargument that's been put forth supported by summary judgment record evidence is that who cares about all that? That could be true. That could be false. But the point is your client just simply wasn't eligible to be a vendor. And that's why I'm being very precise here. I'm curious. Do you have evidence that your client was, in fact, qualified and eligible to be a vendor? Or are you simply just denying it but not with evidence? I think there are a number of responses. We were admitted into the program, so obviously we were qualified and eligible to begin with. There's no dispute about that. We applied for the program. Whatever the qualifications review is, we were approved, and we were in the program. So that's the first thing. The second thing is what Chief Lopez says is on three occasions I found they didn't have insurance. He doesn't tell us when they were. He doesn't tell us how long such a supposed lapse was. It could have been for a week. It could have been for a month. Our case is based on a four-year review. I get that, but it's in the summary judgment record that we have that testimony questioning your client's eligibility. And so since we're here reviewing a summary judgment record, don't we need to have that disputed? Because otherwise my concern for your argument is that you're asking us to create a fact dispute where the record doesn't support that. Well, again, the only evidence in the record on their side of the insurance dispute is this entirely undated. We don't know how long it lasted. We don't know when it was. So that over a four-year period, it could be that on two or three occasions the insurance lapsed. That's possible. But that doesn't negate four years of differential treatment, nor does it explain it. The evidence on our side is that there's an alternate motive. What the district court referred to, the district court I think accurately said, shouldn't a jury be allowed to decide if those are pretexts? On our side is all the other evidence. I get the pretext argument, and I'm actually quite intrigued by it in this admittedly unique area of the law known as this economic liberty substantive due process type concept. I get the pretext argument. My concern is do we even get the pretext if your clients simply aren't eligible during the days in question? Well, but the days in question were four full years. The other thing I would point out is the other thing I would point out that just also gave rise to a thought, which is if it was lapped three times, then obviously that even if we take Lopez's statement as true, obviously what that means is it came and went so that there were periods when it was in force, and we know it was in force in the very beginning because they got admitted to the program. Then he says, well, three times I had to look back. Even if it came and went, what we have is entirely separate evidence to suggest there was a different reason for it. I mean, something else I should point out is that there is an official process for removing an unqualified vendor, and that is you're supposed to give them notice. It's supposed to go to the city manager. You're supposed to be suspended for six months. That's what happens when you lack eligibility, and there's no dispute in this record that that didn't happen. Obviously, the fact that they didn't follow that process is further evidence that it's a pretext. Also, there was a different vendor. There was a Paradise Towing that was owned by someone named Chad Hart, and Hart reported, or at least one of our witnesses, one of the police officers, says that the same campaign of differential treatment was carried out against Hart, even though there's no allegation that Hart ever lacked insurance. So the point is there are other explanations, and if the defense is, well, they didn't have insurance, they should have gone through the process. We don't know when it was, and all he says is it was on three occasions I found there was no insurance. So a jury could easily find that doesn't explain four years of discrimination, of treatment that Cantu wasn't getting. They'd have to be able to show you that you were never eligible, but clearly we were because we were admitted into the program. And then we were apparently, even if Lopez is credited, we seem to have come and gone in the program, but at the same time, we weren't getting the business that was due to us because of Cantu's campaign of treating us differently. So I don't see how that one allegation of insurance can negate our entire case or can remove it from summary judgment, Your Honor. Now, let me turn also to the fact that the district court did not include Lopez's conduct when considering the totality of the evidence and whether it made out a case for the jury. In other words, the district court dismissed this and said, well, this is just two or three occasions of Cantu calling this dispatcher. But actually, the court should have also considered the conduct of Robert Lopez because the jury could find that they were working in tandem. Lopez was a subordinate. Lopez had been hired shortly before this happened. Otherwise, you have to believe that this was a weirdly coincidental campaign from two different sources of city government. And of course, a jury could be allowed to see through that for sure. Let me now address the Anquist point, which was referred to in a footnote in the district court opinion and now is relied upon by the appellee. In Anquist, the Supreme Court and then, of course, this court in Integrity Collision Roundtree found that certain routine discretionary decisions of government, such as hiring and firing or government contracting, aren't eligible for second guessing under the Equal Protection Clause. This case, however, is nothing like that. As I said a moment ago, they didn't go through the normal process of removing us from the program, which is set forth in the regulations. Mr. Cantu did not even have authority over this area of city government. He's not supposed to have anything to do with the towing schedule or towing assignments. He's over here in the city commission. This was an under the table effort to steal business from a competitor that bears no resemblance to a normal discretionary decision to hire and fire or to run a government contracting machine. Indeed, I think what the district court said about this is accurate. The district court said, quote, no official could have reasonably thought that Cantu's actions were lawful. Now, he was saying that in the context of whether we proved our allegations. That was 12 v. 6. But he said, if our allegations are proven and we submit there's enough evidence in the record that they are, no official could have reasonably thought Cantu's actions were lawful and such actions were not within the discretionary decisions of a city commissioner. And that's true. This is nothing like a decision that's been immunized from Equal Protection Review in Inquis or in Integrity Collision. Turning now to our occupational liberty claim, the standard there is where is whether or not, you know, an entity dealing with government has been has had their business seriously impaired or altered by the government action. It's not whether we've been essentially foreclosed entirely from working in our chosen profession or driven out of business, which is more or less the standard that we advocate. That is far too severe under the 14th Amendment. It's not what we have to show. According to this court's case, it's in Doss and in Capel. And so under that standard, whether or not we have severe impairment or alteration of our business, we think we should have survived summary judgment. Miss Pena, who was the owner of APRO, testified that there was a serious loss of revenue, a serious loss of business compared to other areas where they weren't having these problems. Again, the district court got around that and dismissed this by saying, well, this was just, you know, a few occasions, just a few instances. But the district court should have considered the totality of the campaign against APRO and not simply Mr. Cantu's phone calls to Garza, the dispatcher. If you include Lopez's actions, the actions of officers out on the street who would bypass the system and simply call the dispatcher themselves, which Mr. Camdenga testified they were doing ultimately at the behest of Chief Lopez. Then it was a wide ranging and serious infringement on their access to one whole line of business. And it did seriously affect them. It's clear from cases like Cowan, also a toning case in 1987, where the only thing that the plaintiff lost was access to city business. But that was deemed to be enough to stay the 14th Amendment liberty interest claim. Or cases like Shaw, where there was a doctor who was denied hospital privileges, even though he was quite able to go ahead and practice in the private sector. It was just one government hospital that denied him privileges. That stated a liberty interest claim. So we think we've done enough here to surmount the summary judgment hurdle. And we've met the legal standard. And the district court was wrong to dismiss this on grounds of summary judgment. Let me finally turn to qualified immunity. As we argue in our brief, this is not something that was decided by the district court. It wasn't even really fully briefed, although the appellee briefed it and argued it. That's true. We didn't brief it because we thought it had been dissolved. The 12-6 station case, the district court didn't write it. It didn't consider it wasn't a basis for its decision. So there's no reason to go outside the regular order of things and jump a line and decide this before the district court. It should be handled as it typically is in qualified immunity cases by the district court. If this court... Pardon my ignorance. Is this only a damages case? Yes. Or have you also thought of any sort of other relief? No, it's a case for damages. Yeah. If the court does decide to reach out and decide qualified immunity, we think there's no serious way to argue that Cantu wouldn't have been on notice in 2016 that this was unlawful conduct. As the district court found in that quote I read you a moment ago, if our allegations are proven, then there's no way an official could believe that this conduct was legal. Indeed, it arguably skirts Texas anti-corruption law. It certainly seems to violate the Port Isabel Charter, which seems to say that city officials aren't supposed to be getting emoluments and contracts with the city. I guess I'm not sure why that's been ignored in this case. Cases like St. Joseph's Abbey made clear that self-dealing or preferring a competitor is not a legitimate basis for government action. On the due process liberty side, again, cases like Cowan, as long as it was 1987, made it clear that this kind of conduct states a claim. So we don't think it's arguable that Mr. Cantu would have been surprised in 2016 to find that this conduct was illegal. Thank you. Thank you, Your Honor, and may it please the court. The difficulty, the main difficulty I had in responding to the briefing here, is that the Appellant A-Pro seems to rely primarily on platitudes and conclusions rather than on evidence and the standards necessary to establish any of their claims, any of its claims. It also completely glosses over Cantu's actual involvement and instead tries to bring in speculation as to whether the police chief or anybody else might have been working with him, but they provide no evidence whatsoever to make that tie like he might want to make. Instead, he just jumps straight to the conclusion. For the equal protection claim, for example, in order to establish it's a class of one selective enforcement claim, in order to establish that claim, he's got to show differential treatment, meaning, first of all, differential treatment, meaning that other tow operators were treated differently. Other tow operators whose licenses were revoked or canceled or delayed did not have the concerns that either they claim Mr. Cantu or anybody else had. Secondly, that we did not have Mr. Cantu or the city did not have a rational basis. Now, as a Supreme Court said in Garrett, it's the burden on the plaintiff to prove that no reasonable, conceivable set of facts could establish or support the distinction that's trying to be made. It's their burden to make that establishment show that and they didn't do it. And the third issue is whether there was a discriminatory motive under Gilbert Medea's group. Now, before even getting into those issues, those elements, Integrity Collision specifically said that you cannot establish a class of one claim for removal from a tow list. It specifically said on that, it was relying on inquis, as Mr. Siegel pointed out. Inquis was a prior claim, equal protection claim involving a public employment context, where an inspector was saying, was challenging his removal under certain circumstances. Supreme Court said, we're not going to second guess employment decisions in the public context, in the public employment context. Integrity Collision adopted that and moved on to it said, basically, if it's just one guy complaining about something like this, if the police chief or whoever's in charge making the decision has enough of a basis, we're not going to second guess him, whether it's good enough or not. Blackburn, this court similarly said that APRO had, or that in a circumstance like this, APRO would not have a property interest or an entitlement to receive any certain number of tow referrals. And Wrecker Works, also in this court, said that discretionary authority to be removed from a list does not give you a property interest. Now, for the differential treatment, basically, the only basis they have is that the only argument, the only evidence they submitted was that statements, affidavits from three people, former officers Martinez, Cooper, and Garza. Martinez and Cooper specifically said, we have no idea. We did not say anything about Cantu. His name's not even mentioned in it. We're just saying we thought we were treated unfairly, differently. Then you have Garza, who's the only one who said three times, Mr. Cantu said to bypass APRO because the insurance for his license had expired. Now, we submitted the evidence to the court through the conclusions from the Texas Department of Licensing, which specifically said that Isla Towing, with whom APRO, which is the company APRO used, APRO was a company named Isla Towing, so it's on the side of the trucks. APRO's license expired on June 13, 2017. There's no evidence, no indication of when it did get re-licensed, but there's at least a period of time when Isla Towing is not authorized. Then you've got APRO's charter was forfeited from January 26, 2018, until sometime between July of 18 and May of 19. That's at page 926 of the record. It also said Eduardo, who was their tow operator, was unfit for licensure at least by January 10, 2020. Now, all that shows that there's a period of time, quite a lengthy period of time, when APRO would not have been able to conduct, was not licensed or insured to conduct towing operations. It's not our burden to show that we did certain things or we didn't do certain things on a specific date. It's particularly difficult for us to say that when you've got a witness who's saying, well, sometime on three times, I think somebody told me something. Well, we can't go check that. It's up to the plaintiff to establish when that happened and then to say, look, I was licensed on this date and they said no, or I was insured and they said no. He also identified no unequal state action by Cantu, even if what he's saying does make sense. To the extent he might be claiming a disproportionate impact, Kelly said that won't get you there. So the second issue is whether we have a rational basis for the actions we took or the actions they're claiming Cantu took. Remember, under Garrett, it's up to them to establish that we had no rational basis. Let's say even that we skipped him, that Cantu said skip APRO because they don't have insurance or they don't have a license. It's not valid at this time. They haven't identified when they're saying we did that or Cantu did that. So they can't be saying that, in fact, they did. They haven't come up with anything. It's up to them to show that we did not have the authority to say that. And all we have to do is come up with an explanation. It doesn't even have to be a good explanation. A recent decision, Martinez versus New Deal ISD, that came out 802 Federal Appendix 98. A recent case where the court said, quote, when conceiving of hypothetical rationales for a government action, the assumptions underlying those rationales may be erroneous so long as they are arguable. We don't have to come up with a perfect explanation. We just have to have an arguable basis to qualify as a rational basis. Integrity basically said that the chief, a police chief's objective assessment would be enough to preclude a tow company from a list. Roundtree authorized removal from a list because the license had expired. Because the only complaints they have against Cantu was under 1983, you have to allege he acted under color of law. Because the only basis for liability is for actions under color of law, any discretion given to the police chief would similarly be given to Cantu because they're complaining about his actions under color of law. They're not complaining about personal actions. This isn't intentional affliction. I'm sorry, tortious interference with a business relationship where you might be able to make some other type of claim. For these types of claims, it's under color of law. So that discretion that's set out in Roundtree and Integrity would be extended to Cantu as well. And the third element is discriminatory motivation. Now, Dovie Silbey and Brian V. Madison both talked about you have to have some discriminatory motive, either sex, race, religion, or the exercise of constitutional right. They've identified none of that, no basis, no evidence to establish there was any discretionary motive. What they're claiming is that Cantu had some financial interest in trying to do something, that he wanted to make more profits somehow or some other family member could make some profit. But that would just mean that it was based on financial motivations, not based on any constitutional or constitutionally impermissible motivations. There's a big difference there. So bottom line is there's three elements. He did not provide evidence rather than just conclusory allegations. He did not provide evidence to establish either one of those bases. And because of that, he can't establish his equal protection claim. Now, I'm going to move on to the liberty interest claim, unless one of you has a question for me at this point on the equal protection. Hearing none, I'm going to move forward. On the liberty interest claim, basically, the discussion has been pretty straightforward in terms of what is required to establish a liberty interest claim is that Cantu's actions, whatever they might be, completely foreclosed APRO from engaging in the towing business. That started with Roth back in 1975. Blackburn specifically also said you don't have a liberty or a property interest in remaining on a tow list. All they're complaining about, all APRO's complaining about, is that Cantu three times made comments to Mr. Garza saying that, hey, don't put him on the tow list because either his insurance or his license has been expired. There's evidence showing that there was times, but plaintiff never identified what times they were allegedly complaining about. Integrity also said at note four, somebody like APRO does not have a right to control the tow list as long as they maintain the right to continue to do business with private individuals. Counsel referenced the Shaw case, which basically denied a podiatrist medical privileges at a local hospital. And they said, yes, there was something to that. The court never discussed whether that podiatrist, he had previously been operating in Atlanta and northwest, northeast Atlanta. And now he wanted to be over in this other area, which is east of Atlanta. But the court never got into whether he was completely precluded otherwise from engaging in his profession. Sorry about that. Bonds, a similar case that I think he wanted to rely on, saying that a pharmacist who sought a waiver to work from the DEA didn't get it, stated a claim. But in that circumstance, basically, without the waiver, he could not be a pharmacist. It's somebody who had been found guilty of criminal action. And he was asking for a waiver from the DEA. DEA didn't want to give it to him. And without that waiver, he couldn't be a pharmacist anywhere. But anyway, getting back to the liberty interest, all they ever said Gantoo did was on three times asked to bypass APRO. That would not be what the U.S. Marine Corps said in Cannes. That would not constitute a complete prohibition of the right to engage in a calling. To the contrary, Mr. APRO's business was primarily focused on South Padre Island, which is across the Queen Isabella Causeway. There's no evidence that APRO ever had any business in Port Isabel that was somehow lost, that was changed, that was damaged. He wants to say that he wanted to break into the business, but all he got were these three comments that he claims Mr. Gantoo made, but he doesn't have established how that completely eviscerated his ability to engage in a calling. More to the point would be something like Cowan, where when he was kicked off of the Toe Association group, that Toe Association group assigned both private and public toes. So when he was kicked off, he couldn't engage in any private toes or the public toes that he's trying to get. There's a number of cases that show specifically what's not enough for a liberty claim. I'd refer the court to Doss, which said it's a Fifth Circuit case, which said a brief interruption in a business in that case where the defendant was harassing patrons, the sheriff and others were harassing patrons, did not deprive that plaintiff of a liberty interest because it was just a brief interruption in business, kind of like whatever these three occasions might have been or whenever they might have been. Aldo Asari is a similar case in this court in which the court held that a gag order  Basically, that journalist wanted to investigate some particular scenario at that city. And the court said, look, you can still go investigate other stuff. We're not precluding you from working as a journalist. You still have a basis for a claim. Dink Stream is a lower court case out of the Middle District of Louisiana, where the court held it was affirmed by this court, but it held that a loss of $1.5 million in a state contract, even that did not violate the liberty interest because that company could still continue to operate and the loss did not destroy the company's business. As the evidence shows, April was still free completely to engage in his profession. He eventually chose to sell his business for $2 million, a business he created from scratch. April created from scratch, sold it for $2 million. Whether he's still operating in this area, I don't know. My understanding, he might be. But regardless, that would not indicate that he was either forced to go out of business or that he couldn't do business because he still was able to make that significant project. At most, what he's arguing is that Cantu's actions might have been a slight impediment or a disadvantage, but he could still continue to pursue his business. There's no evidence that Cantu did anything to interfere with his private business. I would suggest to the court that the problems were more because of Eduardo's criminal history. There's some reference to that. And TDLR specifically explained why they were being restricted and how Eduardo's involvement in that business affected whether they get licensed and whether they can continue to get licensed. I would just make a reference to the reference counsel made to the findings by the district court at the 12B6 motion where you rely on the allegations made in the pleading. And at that point, they said, no. The judge said, no, we're going to let you do discovery, collect your evidence. On the summary judgment, they were required to come forward with actual evidence, which they did not do. When they did not do that, at that point, we were able to move for summary judgment because there's no evidence to support the claims on which they had the burden. He referenced four years of disparate treatment, but he has no evidence of that. That, again, goes to the conclusory allegations that he's made, the conclusions and platitudes that he wants to argue. All this evidence of either Cantu and Lopez working together or any other action being taken, there's no evidence of it. He wants to argue conclusions based on speculation, but he's been able to provide nothing on that. Your Honor, I don't really have anything else that I wanted to present to the court. What is your understanding of the summary judgment record in terms of the quantum of alleged disparate treatment? You're saying it's not four years, but what was it under your reading? I'm saying there's none because I'm relying on the evidence. Tell me what the disparate treatment was. Well, I thought there were at least these handful of days where the— Go ahead. I could explain. Basically, there was three witnesses who provided affidavits, Garza, Leilani Cooper, and— Actually, there was four, but he's not relying on the fourth. David Martinez, Leilani Cooper, and Daniel Garza, I believe were them. No, Joe Garza. Joe Garza is the one that he said called him three times, told him three times to call Cantu because— because the insurance was expired or out of commission, never identified specific dates. And as we showed, Lopez's—as Chief Lopez explained, that APRO's insurance and license did expire on a number of different times. That's all he said. Your take is there were three days or three incidents where APRO would have wanted to be involved in the nonconsensual towing, and the state— Sorry, the local department did not allow APRO to participate because of these alleged insurance issues. I'm just trying to get a sense of the universe of incidents. What I would—largely, yes. First of all, there's no evidence that actually they didn't on any particular days. The allegation or the affidavits is by Joe Garza is that three times Cantu came and told me to. I'm not real clear as to whether he actually did or not on those three days out of the four years that Mr. Siegel was talking about. I'm not sure whether he actually did not allow the assignment on those days to APRO or not. Does the record—yeah, so I'm— The record would show. My question, does the record indicate whether during this four-year period APRO was ever even once allowed to participate? No other evidence. There's no other evidence other than those three days that Mr. Garza is saying. As far as we know, the summary judgment record is silent. It could be that APRO was allowed to participate all four years except for those three days, or it could be that they weren't allowed to participate for four consecutive years. But your point is we have no idea. Actually, my point is their burden is to show that APRO was not allowed to. The assumption or the understanding would be that unless they said on this day or on more than these three occasions they were not allowed, without any evidence to say there was any other day, we can't assume that there was any other day. APRO just wants to say there were all these other days, but they don't have any evidence to say any basis. The closest you get is Garza saying three days. The other two witnesses never even mentioned Cantu. The other two, Cooper and Daniel Garza, never even mentioned Cantu as to having any input or whether APRO ever did not, was not allowed to be on the total list on anything other than those three days over that four-year period Mr. Siegel was talking about. I don't have anything else, Your Honor, and I would ask that the judgment of the district court be affirmed. Mr. Siegel, you have five minutes. Thank you, Your Honor. I want to address the question about the quantum of the evidence. If you look at Garza's affidavit, he says that Cantu called him on three occasions. Those were the only three occasions that stood out in his mind. He said it happened several other times. He said that Lopez called him repeatedly. He says that Lopez changed the schedule. On several occasions, Lopez would simply take a schedule, APRO had assigned days, and he would eliminate APRO right there and then. Then there's testimony from Cantu. Is it fair to assume that any company doing this business would have records of when they would engage in a particular non-consensual towing act? Yes, Your Honor. It's not accurate, as counsel just said, that there's no documentary evidence. Look at page 1100 in the record. That's actually a colloquy and a deposition, but they're referring to towing logs, which are also in the record. There are logs for several years in this record that show who was assigned and who supposedly were going to get jobs then. And so in the deposition of Mr. Lopez, he was confronted with several days where, according to the towing logs, jobs were supposed to go to ISLA. But according to emails that were sent by ISLA saying we didn't get jobs, you know, why did those jobs go to Cantu? And Lopez was asked, why did that happen? And he said, I don't know. So you can compare their towing logs in this record. You can compare when people were supposed to get the job. OK, so you're saying that there are dates in the record where the following two things were true. One, APRO should have gotten work but didn't. And two, no allegation that APRO was not qualified to do the work on those days. Well, certainly one is true and one is at page 1100. Well, respectfully, I'm not sure we need both because it's impossible to line them up because the defendant hasn't told us when our insurance was supposedly inoperative. All we know is that it's your company. It's your clients. Well, I don't have records of their own insurance coverage. I mean, I don't believe I'll certainly after this argument, check the record again and notify the court. I do. I would absolutely do that. But, you know, I don't believe it has documentary evidence. Possibly there's testimonial evidence for depositions. I'm not remembering. But I guess my point is we know we qualified for the program. We were in the program. We remained in it. In 2020, there's no doubt that we were in the program. So for four years we were in the program. And then we have testimony from one witness on the other side who says on three occasions I had to suspend them because of insurance. We don't know how long it lasted. We don't know when it was. This is why summary judgment is inappropriate in this case because we have evidence on both sides. We have motive evidence for why they would have been not allowed jobs on our side. Testimony from Garza as to what Lopez told him, saying, well, the commissioner can do what he wants. We have evidence for the fact that other companies were also leaned on, even though there's no question about their insurance. And then on their side, we just have this entirely indistinct, you know, on three occasions I had to suspend them. Could be for a week, could be for two days, could be for a month. Since that evidence doesn't lie, it was their burden, obviously, to show an absence of a factual dispute. And since that evidence doesn't line up, we submit it should go to the jury as to whether or not, you know, what the motive, what the reason was. There's evidence on both sides for what the reason was. And that's why it has to be decided by a jury. One other thing I would point out is that during this period when supposedly our license, you know, had lapsed and whatever, whenever the insurance was supposed to have been a problem, we did get jobs. You know, we were getting jobs, just not as many as we were supposed to. So you can look at the, you know, again, this is our brief. You can look at the towing logs starting in 2017, going to 2018, which is during the period that we were supposedly suspended for licensure under the TDLR documents. You got jobs from the city or from others? No, from the city, from the city. So what I'm saying, this is proof that there was no suspension of us. You know, we know it didn't go through the regular process where we would have been suspended for six months. We would have been given notice. It would have been done by the city manager. It was entirely ad hoc. But just to be clear, because you mentioned the suspension a few times, just because the city didn't kick you off the list in a more prolonged way doesn't mean they didn't have a basis for not sending you work on particular days. Right. I mean, they are allowed lesser alternatives. No, I mean, first of all, they're all we know that what they're allowed to do is what's in the code. I would say it's evidence. It's so they know for sure that if somebody on the list is ineligible, they just happen to stay on the list. You're saying they have to send that company work until they go through the more, I assume, laborious process of expelling them from the list. I'm saying this is not common sense. No, let me let me agree with your honor. I think that's right. I'm saying the fact that they didn't go through the formal process is evidence that it didn't happen. That's my point. Like, if there had really been a serious insurance problem, one can assume it's fair for a jury to infer they would have followed the regular process. They didn't do that. So that that proves our case that this was an ad hoc scheme where I can't do was simply trying to be very candid. But what I'm looking for, and if you can file something that provides it, what I'm looking for is evidence in the summary judgment record of the following two things. One days where you should have gotten the work and didn't. And to, again, record evidence that you were qualified and eligible on those days. It sounds to me that you're in an appreciated act of candor saying that the second doesn't exist. And so be it. That's just a problem with the summary record. But if it does exist, I certainly would like to know. Thank you. Thank you. Thank you. Recording stopped. Take the case under advisement. And we have one. This is the last case. So this panel will be adjourned until 930 tomorrow morning. Is that correct? Right. Got it. OK. See you then. Thank you.